

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 19, 2018

**BY ECF**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

   Re: *United States v. Joseph Gerardi*, S2 16 Cr. 776 (VEC)

Dear Judge Caproni:

  The defendant in the above-captioned case, Joseph Gerardi, is scheduled to be sentenced on December 6, 2018, having been convicted, following a jury trial, of one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of providing false statements to federal officers, in violation of 18 U.S.C. § 1001, all arising from his participation in a fraudulent scheme to direct hundreds of millions of New York State taxpayer dollars to his company. Under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), the sentencing range applicable to the defendant's conduct is 70 to 87 months' imprisonment. For the reasons set forth below, in order to satisfy the goals of sentencing, and consistent with the recommendation of the United States Probation Office, the Government respectfully submits that the defendant should be sentenced principally to a substantial term of imprisonment, though, in light of the sentencing factors set forth in 18 U.S.C. § 3553(a), a sentence below the applicable Guidelines range is warranted in this case.

**I. BACKGROUND**

  **A. Offense Conduct**

  This case involves Gerardi's participation in two separate, significant conspiracies reaching into the highest levels of State government. In the first, Gerardi bribed a senior official in the Governor's office, Joseph Percoco, in exchange for official action to benefit Gerardi's

company, COR Development ("COR").[1] In the second, Gerardi conspired to rig contracts to direct large New York State economic development projects to COR.

### 1. The Percoco Bribery Scheme

In 2014, COR faced a significant obstacle to completing one of its large construction projects—the development of Syracuse's Inner Harbor. Although the Empire State Development Corporation ("ESD"), a New York State economic development public benefits corporation, had awarded COR a $1.5 million grant in connection with the project, ESD had also determined that COR was required to sign a Labor Peace Agreement ("LPA") and negotiate with a union in order to use the funding to build a planned parking lot near a hotel within the development. In COR's view, the LPA would significantly increase the cost of the project, and COR had been unable to reverse ESD's decision requiring the LPA.

Through Todd Howe, a lobbyist with unusual closeness to and influence over the Governor and members of the Governor's Office, Gerardi and his co-defendant, Steven Aiello, agreed to pay Percoco in exchange for Percoco's advocacy to reverse ESD's decision, and as other opportunities arose. (*See* January Trial Tr. 2093-101.) Specifically, in mid-August 2014, when Percoco was soon to return to the Governor's office from his role as campaign manager for Governor Cuomo, COR made its first payment, facilitated by Howe, of approximately $15,000 to Percoco. (January Trial GX 555, 1606A.) COR sent the money through Howe's shell company, and Percoco directed Howe to write a check to Percoco's wife, rather than paying Percoco directly. The payment to Percoco came shortly after Aiello told Howe he needed "Joe P." to "help on [the LPA]." (January Trial GX 551.) Despite months of effort, COR had been unable to convince ESD the parking lot project did not trigger the LPA law. (January Trial GX 550, 692.) Less than two weeks after the first payment, Gerardi requested Percoco's intervention to reverse the costly ruling by ESD. (January Trial GX 556A (requesting that their "labor consultant . . . try to resolve this matter").)

In late October, Aiello and Gerardi made another corrupt payment of approximately $20,000 to Percoco, again using Howe as a pass-through. (January Trial GX 1606B.) On or about December 3, 2014, just days before Percoco officially resumed his role as Cuomo's Executive

---

[1] Although Gerardi was acquitted of the charges relating to his participation in the Percoco bribery scheme, the Government proved that conduct by more than a preponderance of the evidence, and therefore the Court should consider it at sentencing. *See, e.g.*, *United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012) ("A district court may treat acquitted conduct as relevant conduct at sentencing, provided that it finds by a preponderance of the evidence that the defendant committed the conduct."); *United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005) ("[D]istrict courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct, as long as the judge does not impose (1) a sentence in the belief that the Guidelines are mandatory, (2) a sentence that exceeds the statutory maximum authorized by the jury verdict, or (3) a mandatory minimum sentence under § 841(b) not authorized by the verdict."); *United States v. Reese*, 33 F.3d 166, 174 (2d Cir. 1994) ("[W]hen determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal.").

Deputy Secretary, Gerardi again pressed for Percoco's help in resolving the LPA issue. (January Trial GX 583, 590.) In response, Percoco successfully pressured ESD, through Andrew Kennedy, the Assistant Secretary for Economic Development and later Deputy Director for State Operations, to reverse its position, eliminating the need for COR to negotiate an LPA. (January Trial Tr. 1274-76 (testimony of Andrew Kennedy).) In response to Percoco's pressure, Kennedy reached out to ESD and directed the agency to reverse its decision. (January Trial GX 587, 1509.) After the decision was reversed, Gerardi thanked Howe and Percoco for their efforts, and mocked a State employee who failed to appreciate that the decision had been made by Percoco. (January Trial GX 591.)

Ultimately, COR did not use the $1.5 million of ESD funds even after they were released from the LPA requirement. But the trial evidence showed that had COR decided to use the ESD funds and been held to the LPA requirement, its costs would have increased significantly, possibly enough to prevent the project from going forward. (January Trial Tr. 1266, 5337 (LPAs make projects more expensive); January Trial GX 556A ("[construction] will not be able to proceed if an LPA is required").)

Aiello and Gerardi again used Percoco's official influence and position of power to benefit COR in September 2015, well after Percoco had returned to the Governor's Office as Executive Deputy Secretary. As set forth further below, COR had previously been named the preferred developer for CNSE in Syracuse after Aiello, Gerardi, Howe, Alain Kaloyeros, and others worked together to rig the bidding process. Pursuant to that fraudulent bidding process, COR was awarded a contract worth approximately $15 million to construct a film hub (the "Film Hub"), as well as a separate contract worth approximately $90 million to build a manufacturing plant. (Presentence Investigation Report ("PSR") ¶ 58.) By summer of 2015, however, the state had not yet released a significant portion of the funding allocated to the two projects. In response to requests for help from Aiello and Gerardi, which were conveyed to Percoco by Howe, Percoco exerted influence over at least two supervisors at the Division of Budget ("DOB")—Michael Novakowski and David Lara—to process the release of funds for the Film Hub and the manufacturing plant projects. (January Trial Tr. 766, 844; January Trial GX 615.) In response to pressure from Percoco, the DOB approved the projects, and funds were released.[2] (January Trial GX 1224.)

---

[2] Around the same time, Aiello had Percoco use his official position and influence to benefit Aiello in additional ways. Percoco secured a salary increase of approximately $5,600 for Aiello's son, who worked in the Executive Chamber of the Governor's Office. In September 2015, Aiello, dissatisfied with a $2,000 raise for his son, sent a text message to Howe, pressing for a further raise and stating, "I have been loyal as the day is long." (January Trial GX 631.) Howe forwarded that text message directly to Percoco, with some additional facts, indicating that Aiello wanted Percoco to know the full chronology. In response, Percoco instructed and caused multiple Executive Chamber and Office of General Services employees involved in human resources—Theresa Brennan, Nancy Nemeth, and Joanne Fryer—to authorize an additional raise for Aiello's son. (January Trial GX 628, 652.) Aiello also requested that Percoco intervene in a minor work squabble involving Aiello's son. Specifically, Percoco forced Andrew Ball, a low-level employee

### 2. The Buffalo Billion Fraud Scheme

From approximately 2013 through 2015, Gerardi engaged in a scheme to rig and corrupt the process leading to New York State-funded construction contracts worth in total more than $850 million. Gerardi's co-defendant, Alain Kaloyeros, the head of a college of the State University of New York, used his position and influence to tailor the bidding process for those contracts to favor the clients of his lobbyist, Todd Howe—namely, COR and the Buffalo-based construction company owned by Ciminelli (LPCiminelli). (PSR ¶¶ 38-42, 46-50.) Kaloyeros, Howe, Aiello, Gerardi, and Ciminelli worked together to deceive Fort Schuyler Management Corporation (a not-for-profit affiliated with the State University of New York) by, among other things, secretly tailoring the required qualifications for those development deals so that COR and LPCiminelli would be awarded contracts in Syracuse and Buffalo, respectively, without meaningful competition, while falsely representing to Fort Schuyler that the bidding process was legitimate and competitive. (PSR ¶ 50.)

The opportunity for this fraud arose from New York Governor Andrew Cuomo's initiative—referred to broadly as the "Buffalo Billion"—to invest a billion dollars in the Upstate New York region in an effort to revive the upstate economies and bring jobs back to the region. (PSR ¶ 45.) The Governor's Office empowered Kaloyeros—who was head of the College of Nanoscale Science and Engineering ("CNSE") and ran Fort Schuyler Management Corporation ("Fort Schuyler")—to propose projects to be funded with State money, and entrusted Kaloyeros to oversee the application processes for those projects. (PSR ¶ 49.)

Kaloyeros could not have reached this position of trust and power without the help of Todd Howe. In or around January 2012, Kaloyeros retained Howe to serve as a consultant to CNSE. (PSR ¶ 47.) Howe's relationship with the Governor and his senior advisors allowed Howe to alleviate the Governor's Office's suspicions of Kaloyeros, and eventually to position Kaloyeros to lead the Buffalo Billion initiative. (PSR ¶ 47.) Howe's connections allowed Kaloyeros to retain a prominent and lucrative job within the State University of New York ("SUNY")—indeed, Kaloyeros has been widely reported as having been the highest paid State employee in New York. During this same time period, Howe helped Kaloyeros gain the Governor's support for establishing Kaloyeros's own SUNY campus to lead—a position of prestige and importance to Kaloyeros. (PSR ¶ 47.) In addition to serving as a consultant for Kaloyeros, Howe also provided lobbying and consulting services to COR (Gerardi's company), which paid Howe to assist with the Buffalo Billion projects.

Consistent with Fort Schuyler's practices, as well as the practices and policies of SUNY, the SUNY Research Foundation, and the State of New York, and at Kaloyeros's direction, Fort Schuyler issued request for proposals ("RFPs") to create a public competition to select construction partners for the Buffalo Billion projects chosen by Kaloyeros. (PSR ¶ 48.) Unbeknownst to the individuals at Fort Schuyler charged with administering the competition and selecting a winner, however, Kaloyeros and Howe arranged to steer the projects to Howe's clients COR and

---

who had a difficult relationship with Aiello's son, to move to a less desirable floor. (January Trial Tr. 1453, 4966-67; January Trial GX 571.)

LPCiminelli, and secretly solicited from Aiello, Gerardi, and Ciminelli qualifications of COR and LPCiminelli to put in the RFPs so that the RFPs would request qualifications unique to those companies. (PSR ¶¶ 49-54.) In addition, Kaloyeros and Howe provided the pre-selected developers with advance copies of the RFP and solicited their feedback, advantages that were not given to any other development company. (PSR ¶¶ 49-54.)

As a result of this scheme, COR was named a "Preferred Developer" of CNSE in Syracuse, New York, and ultimately awarded construction contracts worth $15 million and $90 million to build a film center and LED light manufacturing plant, respectively. (PSR ¶ 58.) Of that $105 million, COR Development retained an 8% management fee, or approximately $8,400,000. (*See* PSR ¶ 69.)

On June 21, 2016, during the course of the Government's investigation, Gerardi, accompanied by counsel, agreed to sit for a voluntary interview. (PSR ¶ 60.) During the interview, Gerardi made multiple false statements regarding his involvement in the Percoco bribery scheme and Buffalo Billion fraud scheme, including lying about the meaning of his hand-written markup of the RFP and the context of his emails with Howe and Aiello. (PSR ¶ 60.)

### B. Guilty Verdicts and Sentencings

On March 13, 2018, a jury considering the Percoco bribery-related charges acquitted Gerardi of the charges relating to that conduct, but returned a verdict of guilty as to Aiello on one count of conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349. The jury further found Percoco guilty on multiple counts relating to his receipt of bribes from Aiello and from Peter Galbraith Kelly.

On July 12, 2018, a jury considering the Buffalo Billion fraud-related charges returned a verdict of guilty as to all counts against Gerardi and his co-defendants, Kaloyeros, Aiello, and Ciminelli. Specifically, Gerardi was convicted of one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and one count of wire fraud, in violation of 18 U.S.C. § 1343, each of which carry a maximum term of imprisonment of 20 years. Gerardi was also convicted of one count of providing false statements to federal officers, in violation of 18 U.S.C. § 1001, which carries a maximum term of imprisonment of five years.

Two of Gerardi's co-defendants have been sentenced. Specifically, Percoco was sentenced by the Court principally to a term of imprisonment of 72 months. Kelly, who ultimately pleaded guilty, was sentenced principally to a term of imprisonment of 14 months for defrauding his employer into hiring Percoco's wife.

## II. APPLICABLE GUIDELINES RANGE

The Government and the Probation Office agree that Gerardi's total offense level is 27, which, when combined with a Criminal History Category of I, yields a Guidelines sentencing range of 70 to 87 months' imprisonment. (PSR ¶¶ 86, 90, 135.) Specifically, the applicable Guidelines provision, Section 2B1.1, provides for a base offense level of 7 and, as relevant here, an enhancement based on the actual or intended loss from the offense. Because there was an actual

or intended loss relating to the Buffalo Billion fraud scheme, but that loss cannot reasonably be determined, the gain to COR from the offense—calculated as the fee charged by the company—is used as an alternative measure of loss, resulting in a 18-level enhancement, corresponding to a $8,400,000 gain. *See* U.S.S.G. § 2B1.1(b) & cmt. 3. Because Gerardi lied to federal officers to instruct their investigation, an additional 2-level enhancement applies. (PSR ¶ 82.)

Gerardi has objected to the calculation of his offense level on the ground that the Government has not established that a loss occurred. "Loss for purposes of the fraud guideline . . . is defined as 'the greater of actual loss or intended loss.'" *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 103 (2d Cir. 2014) (quoting U.S.S.G. § 2B1.1 cmt. 3(A)). The Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict," including "intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. 3(A)(i), (ii).

Here, the Government has proven that there was an intended loss. Indeed, conspiring to rig an RFP to prevent other companies from fairly competing only makes sense if the goal is to ensure that a better or lower price competitor cannot win the bidding, and a notable feature of the bid-rigging scheme here was to prevent evaluation based on price. As Kevin Schuler testified, COR's counterpart in the fraud, LPCiminelli, did not want to afford an opportunity for another company to compete by offering a lower price (*see* June Trial Tr. 1096), and the jury found beyond a reasonable doubt that the defendants exposed Fort Schuyler to a risk of economic harm (June Trial Tr. 2885-86). In short, the Government has proven that Gerardi and his co-defendants intended pecuniary harm. As such, a loss enhancement applies, which may be measured in terms of gain. *See, e.g.*, *United States v. Thomas*, 101 F.3d 1392, 1996 WL 364553, at *3 (2d Cir. 1996) ("[W]hen loss or intended loss cannot be determined with precision, the Sentencing Guidelines support reasonable alternative estimates of loss, including the use of '[t]he offender's gain from committing the fraud.'" (quoting former fraud provision of the Sentencing Guidelines, Section 2F1.1 cmt. 8)).

There was also ample evidence that an actual loss occurred. Mark Balling, formerly senior vice president of Lend Lease, a significant construction company in Western New York that was interested in the Buffalo Billion projects, testified that during the relevant time period, Lend Lease's typical fee for construction management at risk was 2% to 2.5% for projects under $100 million in size, and less for larger projects. (June Trial Tr. 1512.) Steven Bills, vice president of LeChase Construction Services, another construction company in Western New York interested in the Buffalo Billion projects, similarly testified that LeChase's typical construction management fee ranged from 2% for projects in excess of $200 million to 4-5% for projects in the range of $1 million to $5 million. (June Trial Tr. 1613.) It is not a coincidence that LPCiminelli charged a 3.5% fee on a $750 million project and COR charged an 8% fee on its $15 million and $90 million projects.

Because a loss occurred, an enhancement applies under Section 2B1.1(b). There is, however, no reasonable way to determine the exact loss because the defendants' scheme worked: they forestalled a real competition, making it not reasonably possible to determine the lowest price

Fort Schuyler would have obtained absent the fraudulent scheme. Accordingly, gain may be used as an alternative measure of loss, and it is clear in this case that gain provides a reasonable and apt estimate of the loss for the purposes of imposing an appropriate enhancement under the Guidelines. U.S.S.G. § 2B1.1 cmt. 3(B). First, the scope and impact of this fraud was enormous: it went to the control over and fair use of hundreds of millions of taxpayer dollars, and adversely impacted not only Fort Schuyler's disposition of that money but also the public's faith in the fair and just administration of vast sums of taxpayer dollars and public investment in economic development. *See id.* § 2B1.1 cmt. 3(C)(vi) ("The estimate of loss shall be based on available information, taking into account . . . [m]ore general factors, such as the scope and duration of the offense and revenues generated by similar operations."). Second, where the defendants have defrauded the victim of its right to control its assets, the extent of the assets fraudulently taken control of provides a reasonable estimate of the victim's loss. *See United States v. Williams*, 736 F. App'x 267, 273 (2d Cir. 2018) ("[The defendant's] use of fraudulent means to deprive . . . victims of 'potentially valuable economic information' that might otherwise have led them not to pay off those debts, *Binday*, 804 F.3d at 570 (internal quotation marks omitted), rendered each payment part of the harm he inflicted by depriving the victims of the right to control their finances, and therefore a reasonable estimate of the victims' loss.").

### III. DISCUSSION

As the Court is aware, the Sentencing Guidelines provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct, protect the public from further crimes of the defendant, and promote respect for the law. *Id.* at 50 & n.6.

The Government submits, consistent with the Probation Office's recommendation, that a substantial prison sentence, though one below the applicable Guidelines range, would be sufficient but not greater than necessary to comply with the purposes of sentencing in this case.

#### A. The Nature, Circumstances, and Seriousness of the Offense

The conduct at issue here was far-reaching and affected multiple institutions relied on by the citizens of New York. Indeed, in just a few years' time, Gerardi bribed one of the most powerful people in State government, causing that person to pressure ESD, the Division of Budget, the Office of General Services, and the Executive Chamber to take actions to benefit Gerardi, Aiello, and their company, Aiello, and participated in a bid-rigging scheme that tainted New York State's most prominent economic development initiative.

Gerardi's bribing of Percoco corrupted the highest reaches of the executive branch of New York State, and ensured that an individual entrusted with vast power over State operations worked not in the interests of the citizens of New York, but in the interests of Gerardi and his real estate development company. As noted by the Court at prior sentencings, Gerardi's conduct has significantly undermined public trust in the State government.

The Buffalo Billion fraud scheme was similarly serious. Although the board members and employees of Fort Schuyler were cynically deceived by the defendants in an effort to take control over enormous amounts of taxpayer dollars, the victims in this case are broader still. Gerardi and his co-defendants deprived honest competitors of the efforts and expense that those competitors spent on what was in truth a hopeless attempt to obtain State business, and, perhaps more importantly, took from those competitors a fair chance to compete for a share of the work and earnings funded by the citizens of New York. Gerardi and his co-defendants also took from the citizens of New York their right and expectation to see that their money would be used to develop and benefit their State, and not as a tool to benefit businessmen and lobbyists with unethical access and influence in State government.

Gerardi's criminal conduct went beyond even his bribery and fraud. When provided an opportunity to speak to the Government, and to cooperate with the Government's investigation, Gerardi neither declined nor provided honest statements to the Government. Instead, Gerardi lied repeatedly and specifically to the Government in attempt to forestall the Government's investigation. This conduct alone requires just punishment.

The defendant's conduct, and its impact on direct and indirect victims mandates a substantial term of imprisonment.

### B. The Need to Deter Criminal Conduct

In this case, not only corrupt Government officials but also the wealthy business interests who choose to exercise influence over those officials in an unlawful manner have been brought to justice. This case represents an important opportunity to deter crimes committed by those in the private sector who believe that they can commit crimes of fraud and corruption with impunity. When sentencing Percoco, the Court stated, "I hope that this sentence will be heard in Albany." (Percoco Sentencing Tr. 75, Sept. 20, 2018.) When sentencing Kelly, the Court stated, "I hope the sentence will be heard in government affairs offices everywhere." (Kelly Sentencing Tr. 65, Oct. 16, 2018.) And when sentencing Gerardi, the Court will send a message to be heard in boardrooms and executive suites everywhere.

### C. The Need to Avoid Unwarranted Sentence Disparities Among Defendants

Gerardi was convicted with three other individuals for their roles in defrauding Fort Schuyler. Although Gerardi was acquitted of the charges relating to his bribery conduct, Percoco and Aiello were convicted (and Kelly subsequently pleaded guilty). The Court has previously sentenced Percoco and Kelly. The Government views Gerardi as less culpable than Percoco, who was sentenced principally to a term of imprisonment of 72 months. In particular, and among other

things, Percoco was a senior member of the executive branch of New York State who betrayed the public's trust, and, like Gerardi, Percoco engaged in multiple criminal schemes.

The Government views Gerardi as more culpable than Kelly, who received a prison term of 14 months. Unlike Kelly, Gerardi engaged in two separate, extensive criminal conspiracies. Additionally, unlike Kelly, Gerardi lied to the Government. Accordingly, the Government submits that a substantially higher sentence is warranted for Gerardi.

Gerardi's codefendants in the bid-rigging scheme have yet to be sentenced. The Government views Gerardi as less culpable than Kaloyeros and similarly culpable to Aiello. Although Kaloyeros did not engage in two separate criminal schemes as did Gerardi, Kaloyeros was a State employee granted enormous discretion and trust by the Governor of New York. The evidence at trial also shows that Kaloyeros was more proactive than his co-defendants in perpetrating the fraud, as he was the individual drafting the RFPs and working to insert qualifications that would steer the awards to his co-conspirators, although Gerardi did actively assist in editing the Syracuse RFP.

Aiello and Gerardi engaged in both criminal schemes together. And although the evidence demonstrates that Aiello had a greater role with respect to the Percoco bribery scheme, in which he directed multiple actions by Percoco, including actions that benefited Aiello's family specifically, Gerardi took on a greater role directing the RFP fraud, including editing the RFP by hand. Similarly, Ciminelli participated in the Buffalo Billion fraud to benefit his company (to a greater extent even than COR) and engaged in obstructive conduct to hide his guilt. Accordingly, Aiello, Gerardi, and Ciminelli should be viewed as similarly culpable.

### IV.  CONCLUSION

For the foregoing reasons, the Government respectfully submits that the defendant should be sentenced to a below-Guidelines-range but substantial term of imprisonment.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:   /s/
Matthew Podolsky
David Zhou
Robert Boone
Janis Echenberg
Assistant United States Attorneys
(212) 637-1947/2438/2208/2597

cc:   Counsel for Joseph Gerardi (by ECF)